**Peter M. ("Mac") Lacy (OSB # 013223)**
Oregon Natural Desert Association
2009 NE Alberta St., Ste. 207
Portland, OR  97211
(503) 525-0193
lacy@onda.org

**Talasi B. Brooks (*Pro Hac Vice application to be filed*)**
Western Watersheds Project
PO Box 2863
Boise, ID  83701
(208) 336-7910
tbrooks@westernwatersheds.org

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

## PENDLETON DIVISION

| | |
|---|---|
| **WESTERN WATERSHEDS PROJECT**, **OREGON NATURAL DESERT ASS'N**, **WILDEARTH GUARDIANS**, and **CENTER FOR BIOLOGICAL DIVERSITY**, | Case No. _____ |
| Plaintiffs, | |
| v. | **COMPLAINT** |
| **SECRETARY OF THE UNITED STATES DEPARTMENT OF THE INTERIOR**, and **BUREAU OF LAND MANAGEMENT**, | |
| Defendants. | **(Environmental Matter)** |

1

## NATURE OF ACTION

1.     This case seeks judicial reversal, vacatur, and other relief with regard to former Secretary of the Interior David Bernhardt's January 19, 2021 decision—issued on the final day of the Trump administration, following a rushed and truncated public process—to grant a new grazing permit and preference to Hammond Ranches, Inc. ("HRI") authorizing it to graze domestic livestock on the Bridge Creek allotments of Steens Mountain in southeastern Oregon in spite of its record of grazing permit violations. The decision challenged here follows a previous last minute decision—enjoined and then vacated as unlawful by this Court in a related case (No. 2:19-cv-0750-SI)—by former Secretary Bernhardt's predecessor, Ryan Zinke, who purported to "renew" HRI's expired grazing permit without finding that HRI possessed a satisfactory record of performance, as required by the Bureau of Land Management's ("the Bureau") grazing regulations. *W. Watersheds Proj. v. Bernhardt*, 428 F. Supp. 3d 327 (D. Or. 2019) (holding unlawful and vacating Secretary's decision); *W. Watersheds Proj. v. Bernhardt*, 392 F. Supp. 3d 1225 (D. Or. 2019) (preliminary injunction limiting grazing in 2019); *W. Watersheds Proj. v. Bernhardt*, 391 F. Supp. 3d 1002 (D. Or. 2019) (temporary restraining order limiting grazing in 2019).

2.     Although the Bureau had decided in 2014 not to renew HRI's permit, based on the operation's failure to comply with the terms and conditions of its permit, including by setting fire to public lands on Steens Mountain, then-Secretary Zinke interfered and, on his last day in office, ordered the agency to renew the permit anyway. This Court set aside and vacated that decision. *Bernhardt*, 428 F. Supp. 3d at 354.

3.     Now, former Secretary Bernhardt has, on *his* last day in office, issued a new decision to grant HRI grazing privileges once again. The former Secretary's Final Decision, dated January 19, 2021 ("January 19, 2020 Final Decision," or "Final Decision") issues a 10-

year grazing permit and preference to HRI for the Bridge Creek allotments over other, better-qualified applicants; apportions forage within the Bridge Creek Area allotments (Hammond, Mud Creek, Hardie Summer, and Hammond FFR); reconfigures the allotment boundaries; and authorizes the construction and removal of a series of range projects within the area.

4.     Following this Court's 2019 reversal and vacatur of the Secretary's prior decision in Case No. 2:19-cv-0750-SI, there was no longer any permit allowing livestock grazing on the Bridge Creek allotments. The Bureau began a public process to consider anew whether to allow grazing on the allotments and, if so, under what terms and conditions. The Bureau began by advertising a notice of available forage and soliciting applications, and the agency had been prepared to issue a decision following the ordinary process set out in its grazing regulations. But former Secretary Bernhardt seized control of that process.

5.     On October 13, 2020, the Bureau mailed a scoping letter to interested publics, requesting comments by October 27, 2020. Around a month later, on December 8, 2020, the Bureau issued a draft "Bridge Creek Area Allotment Management Plan and Environmental Assessment" ("AMP" and "EA"). It allowed only eight business days for public comment on the draft EA and purported to incorporate and respond to all timely comments received within an additional eight business days.

6.     On December 31, 2020, the Secretary's Principal Deputy Assistant Secretary, Casey Hammond, took over the matter from the local Bureau office and issued a Proposed Decision to grant a grazing permit and preference to HRI. The Proposed Decision was accompanied by a final "Bridge Creek Area Allotment Management Plan and Environmental Assessment." "Courtesy copies" of the Proposed Decision (but not the AMP and EA) were sent by email to Plaintiffs Western Watersheds Project ("WWP") and the Oregon Natural Desert

Association ("ONDA") on New Year's Day, but Plaintiffs and other members of the interested public did not receive official copies of the AMP/EA and Proposed Decision until the second week of January. Rather than providing the full time for administrative protest guaranteed by the agency's regulations, former Secretary Bernhardt directed the Bureau to cut off the administrative protest period on Friday, January 15, 2021.

7.      Finally, claiming he was "exercising jurisdiction over this matter," former Secretary Bernhardt issued a "Notice of Final Decision" on Tuesday, January 19, 2021 in the place of the Bureau—purporting to review and resolve 160 protests from the public in less than one business day following the Martin Luther King, Jr. Day weekend. This was less than 24 hours before President Trump left office at noon the next day, and former Secretary Bernhardt declared "there are no further administrative appeals available."

8.      The Secretary's January 19, 2021 Final Decision is unlawful in five major respects. First, the Secretary violated the Federal Land Policy and Management Act ("FLPMA"), 43 C.F.R. §§ 1701–87, and the Department of the Interior's regulations by improperly asserting jurisdiction and by issuing the Decision without opportunities for public participation required by law. Second, the Secretary violated FLPMA and its implementing regulations by improperly determining that HRI was qualified to receive a grazing permit and granting a permit to HRI over other applicants who were qualified. Third, the Secretary and the Bureau violated procedural requirements of the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–4370m-12, by failing to provide information and analysis necessary to ensure meaningful public participation and an informed decision. Fourth, the Secretary's Decision violated FLPMA and its implementing regulations because it does not comply with land use plan requirements adopted to protect the greater sage-grouse. Fifth, the Secretary's Decision violated the Steens Mountain

Cooperative Management and Protection Act of 2000 ("Steens Act"), 16 U.S.C. § 460nnn *et seq*., because the Secretary incorrectly interpreted the Steens Act's purpose and the Final Decision fails to conserve, protect, and manage the "long-term ecological integrity" of Steens Mountain.

9.      Upon information and belief, the rushed, opaque, and highly unusual public processes and repeated intervention by multiple Secretaries of the Interior under the Trump Administration in the Bureau's grazing decisions regarding the Bridge Creek allotments reveals that the Decisions have been tainted by political influence and are not the product of reasoned, lawful decisionmaking.

10.      Plaintiffs, Western Watersheds Project, Oregon Natural Desert Association, WildEarth Guardians, and the Center for Biological Diversity, file this action to ensure that the Secretary is not permitted to once again ignore the law and issue a decision allowing livestock grazing on the Bridge Creek allotments and Steens Mountain without first properly involving the public and fully considering the environmental consequences of that decision. Accordingly, Plaintiffs respectfully request that this Court set aside and vacate the Secretary's January 19, 2021 Final Decision, Final Bridge Creek Area Allotment Management Plan and Environmental Assessment, and grazing permit, and issue injunctive and other relief necessary to avoid harm to fragile and irreplaceable fish, wildlife, and other natural resource values on Steens Mountain.

## JURISDICTION AND VENUE

11.      Jurisdiction is proper in this Court under 28 U.S.C. § 1331 because this action arises under the laws of the United States, including NEPA, FLPMA, the APA, and the Equal Access to Justice Act, 28 U.S.C. § 2412 *et seq*. Despite having their participation burdened by truncated public comment and protest periods, and being deprived of the opportunity to file an

administrative appeal ordinarily available pursuant to the Bureau's grazing regulations, Plaintiffs have exhausted all available administrative remedies. Plaintiffs seek judicial review of final agency actions of the Secretary and the Bureau. *See* 5 U.S.C. §§ 704, 706(2) (actions reviewable and "final agency action").  An actual, justiciable controversy exists between the parties, and the requested relief is therefore proper under 28 U.S.C. §§ 2201–02 and 5 U.S.C. § 701–06.

12.     Venue is proper in this Court under 28 U.S.C. § 1391 and Local Rule 3-2(b) because all or a substantial part of the events or omissions giving rise to the claims herein occurred within this judicial district, defendants reside in this district, and the public lands and resources and agency records in question are located in this district.

13.     The federal government has waived sovereign immunity in this action pursuant to 5 U.S.C. § 702.

## **PARTIES**

14.     Plaintiff WESTERN WATERSHEDS PROJECT ("WWP"), is a non-profit corporation with approximately 12,000 members and supporters dedicated to protecting and conserving the public lands and natural resources in Oregon and the West. WWP has staff and offices in Oregon, Idaho, Wyoming, Montana, Nevada, and Arizona. Since its inception, WWP has advocated to curb ecological abuses from public lands livestock grazing throughout the West, including in Oregon. WWP and many of its members and supporters have long-standing interests in preserving and conserving greater sage-grouse populations and sagebrush habitats in Oregon and other states across the range of the greater sage-grouse.  They also have interests in the preservation of riparian habitats and native fish species, including redband trout.

15.     Plaintiff OREGON NATURAL DESERT ASSOCIATION ("ONDA") is an Oregon non-profit, public interest organization of about 10,000 members and supporters. It has

offices in Portland, Oregon and Bend, Oregon. ONDA's mission is to protect, defend, and restore forever, the health of Oregon's native deserts. ONDA actively participates in Bureau and Department of the Interior proceedings and decisions concerning the management of public lands in eastern Oregon, including on Steens Mountain. ONDA brings this action on its own behalf and on behalf of its members and staff, many of whom regularly enjoy and will continue to enjoy the public lands and resources that are the subject of the final agency decision challenged in this action, for educational, recreational, spiritual, and scientific activities. ONDA has been active in monitoring ecological conditions on public lands managed by the Bureau throughout eastern Oregon, including within the agency's Burns District and on Steens Mountain. ONDA participated throughout the public processes that led to the Secretary's decision challenged here.

16.    Plaintiff WILDEARTH GUARDIANS ("Guardians") is a non-profit organization dedicated to protecting and restoring the wildlife, wild places, wild rivers, and health of the West. Guardians has over 165,000 members and supporters, many of whom have long advocated for the protection and restoration of sagebrush habitats and the species that depend upon them and for responsible land management. Headquartered in Santa Fe, New Mexico, Guardians maintains several other offices around the West, including an office in Portland, Oregon.

17.    Plaintiff CENTER FOR BIOLOGICAL DIVERSITY ("the Center") is a non-profit organization dedicated to the preservation, protection, and restoration of biodiversity, native species, and ecosystems. The Center was founded in 1989 and is based in Tucson, Arizona, with offices or staff throughout the country, including in Portland, Oregon. It has more than 63,000 members, including many who reside in, explore, and enjoy sage-grouse and sagebrush ecosystems in Oregon and throughout the West. The Center advocates for sound public land management to protect species habitat, including habitat for greater sage-grouse and

other sagebrush obligates in Oregon and elsewhere. The Center's officers, staff, and members regularly visit public lands and sagebrush habitats for recreational, scientific, educational and other pursuits, and intend to continue to do so in the future.

18.     The Plaintiff organizations place a high priority on protecting and conserving sagebrush ecosystems and curbing ecologically harmful grazing throughout the West, including in Oregon. They undertake a wide range of activities including education, advocacy, scientific study, habitat restoration projects, and litigation in order to protect and conserve sagebrush ecosystems, often through reducing the effects of ecologically harmful livestock grazing, and to communicate to the public and policy-makers about the values of sagebrush habitats in Oregon. Plaintiffs have participated in the public processes surrounding the Bridge Creek allotments and meet the definition of "interested publics."

19.     Plaintiffs' members, supporters, and/or staff work, recreate, study, and otherwise use and enjoy public lands in Oregon, including public lands in and around the Malheur National Wildlife Refuge and Steens Mountain, where the Bridge Creek allotments are located.  Plaintiffs engage in hiking, camping, cycling, wildlife observation, photography, scientific study, and other activities on public land on and around Steens Mountain and the Malheur National Wildlife Refuge, including the Bridge Creek allotments. They enjoy viewing or attempting to view greater sage-grouse, redband trout, and other wildlife on Steens Mountain and the Bridge Creek allotments, and visiting roadless and wilderness-quality lands in the area, and have been upset by witnessing habitat degradation due to Bureau-authorized livestock grazing in these areas.

20.     The SECRETARY OF THE UNITED STATES DEPARTMENT OF THE INTERIOR is sued solely in his or her official capacity as Secretary of the United States Department of the Interior. David Bernhardt was the Secretary of the Interior at the time the

Secretary issued the January 19, 2021 Final Decision. The current Secretary of the Interior is responsible for former Secretary Bernhardt's decision challenged here. *See* Fed. R. Civ. P. 25(d).

21.     Defendant BUREAU OF LAND MANAGEMENT is an agency or instrumentality of the United States within the Department of the Interior, and is charged with managing the public lands and resources governed by the challenged decision at issue in this case, in accordance and compliance with federal statutes and regulations.

22.     Plaintiffs have Article III standing to bring this action because they are directly injured by the procedural and substantive FLPMA, NEPA, and APA violations alleged herein, which are redressable by this Court. Plaintiffs are injured by the Secretary's January 19, 2021 Final Decision issuing a new grazing permit and preference to HRI because it harms their strong interests in having Executive Branch officials and federal agencies obey federal law and their strong interests in ecologically sound grazing management. Plaintiffs are further injured by the Secretary's and Bureau's decision to issue a grazing permit without required public process because it deprives the agency and the public of full and accurate information concerning the effects of the permit decision and alternative courses of action and deprives Plaintiffs of a legally required, and meaningful, opportunity for detailed input. The January 19, 2021 Final Decision threatens irreparable harm to sagebrush ecosystems, sage-grouse, wilderness, and redband trout and their riparian habitat, all of which Plaintiffs value and enjoy, further harming Plaintiffs' interests.

23.     Plaintiffs' injuries would be redressed if this Court reversed and vacated the Secretary's January 19, 2021 Final Decision and enjoined the Bureau from allowing livestock grazing on the allotments unless and until the Bureau and the Department of the Interior have fully complied with FLPMA, NEPA, and applicable regulations. Unless judicial relief is granted,

Plaintiffs will continue to suffer irreparable harm to their interests from unlawful livestock grazing under the grazing permit.

## LEGAL BACKGROUND

### A.  FLPMA AND THE TAYLOR GRAZING ACT

24.     Two statutes provide the foundation for the Bureau's management of livestock grazing on public lands: the Taylor Grazing Act and FLPMA.

25.     In 1934, Congress passed the Taylor Grazing Act, 43 U.S.C. § 315 *et seq*., to "stop injury to the [public] lands from overgrazing and soil deterioration, to provide for their use, improvement and development, and to stabilize the livestock industry dependent on the public range." *Pub. Lands Council v. Babbitt*, 529 U.S. 728, 733 (2000) (internal quotation marks omitted). To that end, the Taylor Grazing Act granted the Secretary of the Interior the authority to regulate grazing on public lands through issuance of grazing permits and leases. *See* 43 U.S.C. § 315b. Grazing permits are ten-year authorizations "subject to the preference right of the permittees to renewal in the discretion of the Secretary of the Interior." *Id*.

26.     The issuance of a permit to graze livestock on federal public land "shall not create any right, title, interest, or estate in or to the lands." 43 U.S.C. § 315b. Rather, a grazing permit is a revocable license to use public land, granted subject to the conditions the Secretary or Bureau decides to impose. *Pub. Lands Council*, 529 U.S. at 735 (the "conditions placed on permits reflect[] the leasehold nature of grazing privileges").

27.     Despite the Taylor Grazing Act's mandate to improve the conditions of the public lands, they remained in unsatisfactory condition decades later. As a result, in 1976, Congress enacted FLPMA, directing that the Secretary of the Interior, who oversees the Bureau, "shall, with public involvement . . . , develop, maintain, and, when appropriate, revise land use plans

which provide by tracts or areas for the use of the public lands." 43 U.S.C. § 1712(a). The

Bureau "shall manage the public lands . . . in accordance with" these plans. *Id*. § 1732(a).[1] The

plans guide "[a]ll future resource management authorizations and actions . . . and subsequent

more detailed or specific planning, shall conform to the approved plan[s]." 43 C.F.R. § 1610.5-3;

*see also id*. § 4100.0–8.[2]

28.     The Bureau must manage the public lands consistent with the "principles of

multiple use and sustained yield" and "take any action necessary to prevent unnecessary or

undue degradation of the lands." 43 U.S.C. §§ 1732(a), (b). To ensure it has adequate

information to fulfill these obligations, the Bureau must "prepare and maintain on a continuing

basis an inventory of all public lands and their resource and other values." *Id*. § 1711(a). This

inventory "shall be kept current so as to reflect changes in conditions." *Id*.

29.     Under FLPMA and its implementing regulations, the Bureau may allow livestock

grazing on specified allotments on the public lands. *See* 43 U.S.C. § 1752(a); 43 C.F.R. Part

4100 (grazing administration); *see also id*. § 4130.2 (grazing management and permitting); *id*. §

4100.0-5 (defining an allotment as "an area of land designated and managed for grazing of

livestock"). The Bureau authorizes and manages grazing through three types of decisions: a

grazing permit issued pursuant to 43 U.S.C. § 1752(a) and 43 C.F.R. § 4130.2; an allotment

management plan ("AMP") issued pursuant to 43 U.S.C. § 1752(d) and 43 C.F.R. § 4120.2; and

---

[1] The Bureau sometimes refers to these plans as "resource management plans" or RMPs. 43
C.F.R. § 1601.0-1. This complaint uses "land use plan" and "resource management plan"
interchangeably.

[2] Citations to the Bureau's grazing regulations in 43 C.F.R. Part 4100 are to the regulations in
effect as of Oct. 1, 2005, given the injunction of a subsequent revision of the regulations imposed
by the district court in *Western Watersheds Project v. Kraayenbrink*, 538 F. Supp. 2d 1302, 1325
(D. Idaho 2008), *aff'd in relevant part*, 632 F.3d 472, 500 (9th Cir. 2011); *see* 60 Fed. Reg.
9,894, 9,927 (Feb. 22, 1995).

variously-named annual decisions, *see, e.g.,* 43 C.F.R. § 4130.4. A grazing permit typically lasts for 10 years and specifies all authorized use for the area covered, including livestock grazing, suspended use, and conservation use. 43 U.S.C. § 1752(a); 43 C.F.R. § 4100.0–5. Grazing permittees may also hold a grazing "preference" which places them first in line against others for receipt of a grazing permit. *Id*. A grazing permit may incorporate an AMP, which is a grazing plan tailored to the specific range condition of the allotted area. 43 U.S.C. § 1752(d).

30.    Grazing decisions must comply with the guiding land use plan and a violation of the land use plan also violates FLPMA.

*i.  Governing Land Use Plans*

31.    Pursuant to FLPMA's land use planning requirements, the Bureau issued the Steens Mountain Cooperative Protection and Management Area RMP and the Andrews Management Unit RMP in 2005. Together, these two land use plans govern management of the four Bridge Creek allotments.

32.    Both governing RMPs set forth three different categories of grazing allotments, each of which is subject to different monitoring requirements: "I" (or improve), "M" (or manage), and "C" (or custodial). "I" allotments have identified resource concerns and receive priority for implementation, effectiveness, and performance monitoring. "M" allotments have low or no management or resource concerns and are targeted for effectiveness and performance monitoring, unless monitoring data indicate a need for change to management strategy. "C" allotments are the lowest priority for monitoring. For example, in preparing the Bridge Creek allotments EA, the Bureau asserted that there was no monitoring data available for the Hammond FFR allotment, a C allotment, even though it has been grazed under the Bureau's management for decades.

33.    Both RMPs have been amended by the Oregon Greater Sage-Grouse Approved RMP Amendment ("ARMPA"), issued in September 2015. The new amendments, completed as part of a national planning process intended to protect the greater sage-grouse, were intended "to identify and incorporate appropriate measures in existing land use plans to conserve, enhance, and restore GRSG habitat by avoiding, minimizing, or compensating for unavoidable impacts to GRSG habitat in the context of the BLM's multiple use and sustained yield mission under FLPMA." U.S. Department of Interior, Oregon Greater Sage-Grouse Approved Resource Management Plan Amendment ("Oregon ARMPA") 1–7 (September 2015). In the sage-grouse amendment, the Bureau identified wildfire, invasive species, and livestock grazing as three of the greatest threats to sage-grouse and sage-grouse habitat on BLM-administered lands in Oregon. *Id*. at 1–7 to 1–8. To protect sage-grouse, the ARMPA includes these requirements, among others:

- Objective SSS 4 requires the Bureau to manage land resource uses in sage-grouse habitat "to meet the desired conditions" described in the ARMPA's Habitat Objectives Table 2-2, including setting 7- and 9-inch grass height standards for arid and mesic sites, respectively, for grazing between March 1 and June 30. *Id*. at 2–4 to 2–5.

- Objective VEG 3 requires the Bureau to "[r]educe the area dominated by invasive annual grasses to no more than 5 percent within 4.0 miles" of all leks. *Id*. at 2–10.

- MD VEG 12 requires the Bureau to "[a]djust discretionary land uses, such as active use for livestock grazing or recreational uses or seasons, as needed to facilitate attainment and persistence of vegetation restoration objectives." *Id*. at 2–13.

- MD SSS-10 requires that for any management action that would result in habitat loss or degradation, the Bureau must "require and ensure mitigation that provides a net

conservation gain to the species including accounting for any uncertainty associated with the effectiveness of such mitigation. This will be achieved by avoiding, minimizing, and compensating for impacts by applying beneficial mitigation actions." *Id*. at 2–8.

34.     For new authorizations, like the grazing permit at issue here, the ARMPA provides that all authorizations and actions in sage-grouse habitat will conform to or be consistent with the decisions contained in the ARMPA. They will be followed unless there are more restrictive decisions in the existing plans, in which case, the more restrictive decisions will be implemented. *Id*. at 2-1.

35.     The 2015 Oregon ARMPA required "immediate" consideration of its goals, objectives, and management direction. *See, e.g.*, U.S. Department of Interior, Record of Decision and Approved Resource Management Plan Amendments for the Great Basin Region ("Great Basin ROD") 1-41 (September 2015). ("[Immediate Decisions] go into effect when the ROD is signed. These include goals, objectives, allowable uses, and management direction . . . ."). The Bureau's regulations implementing FLPMA likewise require that when a land use plan is revised, existing resource plans and permits, contracts and other instruments must be revised within a "reasonable period of time." 43 C.F.R. § 1610.5-3.

   *ii.  Grazing Decision Requirements*

36.     The Bureau authorizes and manages livestock grazing on the Bridge Creek allotments through grazing permits, allotment management plans, and annual authorization decisions, as described above. Through the Final Decision challenged in this case, the Bureau adopted a new AMP for the Bridge Creek allotments and also decided to grant HRI a new grazing permit and preference.

14

37.     The Bureau's regulations implementing FLPMA provide that a mandatory qualification for applicants for grazing permit renewal or issuance is that the applicant "must be determined by the authorized officer to have a satisfactory record of performance." 43 C.F.R. § 4110.1(b).

38.     The regulations provide that an applicant for renewal of a grazing permit has a satisfactory record of performance "if the authorized officer determines the applicant and affiliates to be in substantial compliance with the terms and conditions of the . . . Federal grazing permit . . . for which renewal is sought, and with the rules and regulations applicable to the permit or lease." *Id.* § 4110.1(b)(1).

39.     The regulations provide that an applicant for a new grazing permit or lease does *not* have a satisfactory record of performance when "[t]he applicant . . . has had any Federal grazing permit or lease cancelled for violation of the permit or lease within the 36 calendar months immediately preceding the date of application"; "[t]he applicant . . . has had any State grazing permit . . . for lands within the grazing allotment . . . cancelled for violation . . . within the 36 calendar months immediately preceding the date of application"; or "[t]he applicant . . . is barred from holding a Federal grazing permit or lease by order of a court of competent jurisdiction." *Id.* § 4110.1(b)(2).

40.     The regulations do not separately define what constitutes a satisfactory record of performance for applicants for a new grazing permit.

41.     The Bureau may only grant a new grazing permit to a qualified applicant. *See id.* § 4130.1-2.

*//*

*//*

*iii. Public Participation Requirements*

42.    Both the Taylor Grazing Act and FLPMA require public participation in grazing decisions, including decisions to issue grazing permits. The Taylor Grazing Act directed that the Secretary "provide by appropriate rules and regulations for local hearings on appeals from the decisions of the administrative officer in charge." 43 U.S.C. § 315h. In FLPMA, Congress declared it the policy of the United States that "in administering public land statutes and exercising discretionary authority granted by them, the Secretary be required to establish comprehensive rules and regulations after considering the views of the general public; and to structure adjudication procedures to assure adequate third party participation, objective administrative review of initial decisions, and expeditious decisionmaking." *Id*. § 1701(a)(5). The Secretary must give the public adequate notice and an opportunity to participate in management planning for livestock grazing and other activities on the public lands. *Id*. § 1739(e).

43.    To comply with this direction, the Department of the Interior drafted its grazing regulations to ensure public participation in grazing decisions. The 1995 grazing regulations that currently govern grazing decisions on public lands allow members of the public to become "interested publics" entitled to be involved in decision-making processes for the management of livestock grazing on specific allotments.  *See* 43 C.F.R. § 4100.0-5 (defining "interested public"). The Bureau projected that "by involving the interested public *early in the decision making process* on such issues as permit issuance, renewal and modification, increasing and decreasing permitted use, and development of activity plans and range improvement programs, there will be fewer protests and appeals because parties will have a better understanding of the

16

final decision and the factors considered in reaching the decision." 1995 Grazing Regulations, 60 Fed. Reg. 9,894, 9,949 (Feb. 22, 1995) (emphasis added).

44.    The Bureau's grazing regulations provide that agency officials must "consult, cooperate and coordinate" with the interested public prior to the issuance or renewal of grazing permits or leases. 43 C.F.R. § 4130.2(b). The agency must also consult, cooperate and coordinate with the interested public in adjusting allotment boundaries, *id.* § 4110.2-4, and in increasing permitted use, *id.* § 4110.3-2. Allotment management plans must be prepared "in careful and considered consultation, cooperation, and coordination" with the interested public. *Id.* § 4120.2(a).

### B. NATIONAL ENVIRONMENTAL POLICY ACT

45.    NEPA is our basic national charter for protection of the environment. It "declares a broad national commitment to protecting and promoting environmental quality." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348 (1989); *see* 42 U.S.C. § 4331. The NEPA process ensures (1) that an agency carefully considers information concerning significant environmental impacts, and (2) that the public may scrutinize the information and participate in the decision-making process. *Methow Valley*, 490 U.S. at 349. By requiring agencies to take a "hard look" at the choices before them and how they "affect the environment, and then to place their data and conclusions before the public . . . NEPA relies on democratic processes to ensure . . . that the most intelligent, optimally beneficial decision will ultimately be made." *Or. Nat. Desert Ass'n v. Bureau of Land Mgmt.*, 625 F.3d 1092, 1099–1100 (9th Cir. 2010) (internal quotation marks and citations omitted).

46.    NEPA requires agencies to study the environmental impacts of proposed actions and the reasonable alternatives that would avoid or minimize such impacts or enhance the quality of the human environment. 42 U.S.C. § 4332(2)(C).

47.    Effects or impacts means changes to the human environment from the proposed action or alternatives that are reasonably foreseeable and have a reasonably close causal relationship to the proposed action or alternatives, including those effects that occur at the same time and place as the proposed action or alternatives and may include effects that are later in time or farther removed in distance from the proposed action or alternatives.

48.    The range of alternatives to be considered is defined in part based upon the agency's "purpose and need" for the project. An agency may not so narrowly define its purpose and need as to unduly restrict consideration of reasonable alternatives. *See, e.g.*, *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 814 n. 7 (9th Cir. 1999).

49.    To carry out this direction, an agency must prepare a detailed Environmental Impact Statement ("EIS") for "all major federal actions significantly affecting the quality of the human environment," but may prepare an EA to determine whether the environmental impact of a proposed action is significant enough to warrant an EIS. 42 U.S.C. § 4332(2)(C).

50.    When preparing an EA, the Bureau must provide for public notification and public involvement. 43 C.F.R. § 46.305; *see also* BLM Handbook H-1790-1 8.2 (Jan. 30, 2008). An EA must disclose the environmental impacts of the proposed action and any alternatives considered, and must "contain objective analyses that support conclusions concerning environmental impacts." 43 C.F.R. § 46.310. Impacts that must be considered include direct, indirect, and cumulative impacts.

51.    If an action may have a significant impact on the environment, BLM must prepare an EIS.

## C.  STEENS ACT

52.    In 2000, Congress passed the Steens Act. The Act created the 496,000 acre Cooperative Management and Protection Area ("CMPA"). The purpose of the CMPA is "to conserve, protect, and manage the long-term ecological integrity of Steens Mountain for future and present generations." 16 U.S.C. § 460nnn-12(a).

53.    The Steens Act defines "ecological integrity" as "a landscape where ecological processes are functioning to maintain the structure, composition, activity, and resilience of the landscape over time." *Id*. § 460nnn(5). This includes "a complex of plant communities, habitats and conditions representative of variable and sustainable successional conditions" and "the maintenance of biological diversity, soil fertility, and genetic interchange." *Id*.

54.    In addition to establishing the Steens Mountain Wilderness Area, the Steens Act also added 29 miles to the federal Wild and Scenic River System, withdrew 1.1 million acres from mining and geothermal development, established a Wildlands Juniper Management Area, and designated the world's first Redband Trout Reserve.

55.    The Steens Act directed the Secretary to prepare "a comprehensive plan for the long-range protection and management of the Federal lands included in the [CMPA]." 16 U.S.C. § 460nnn-21(b). The Bureau completed the Steens Mountain CMPA RMP in 2005. The Mud Creek and Hardie Summer allotments, and parts of the Hammond and Hammond FFR allotments, lie within the CMPA. The Secretary and the Bureau must manage the public lands in these areas "in accordance with" the Steens Act and the CMPA RMP. 43 U.S.C. § 1732(a); *see also* 16 U.S.C. § 460nnn-21(a) ("The Secretary shall manage all Federal lands included in the

Cooperative Management and Protection Area pursuant to [FLPMA] and other applicable provisions of law, including this Act . . . .").

### D. ADMINISTRATIVE PROCEDURE ACT

56.    Violations of FLPMA and NEPA are reviewed under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706. Under the APA, a court must set aside actions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; "in excess of statutory jurisdiction, authority, or limitations", or "without observance of procedure required by law." *Id*. § 706(2).

57.    Agency action is "arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

58.    As this Court has observed, when an agency's action represents a policy change, the agency must provide "a reasoned analysis for the change beyond that which may be required when an agency does not act in the first instance." *Bernhardt*, 428 F. Supp. 3d at 336 (citing *State Farm*, 463 U.S. at 42). If an agency "ignores or countermands its earlier factual findings without reasoned explanation for doing so, the policy change violates the APA." *Id.* (citing *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 537 (2009)).

//

//

//

## FACTUAL BACKGROUND

*i.  HRI's Grazing Permit.*

59.    Hammond Ranches, Inc. is a livestock ranching business. It is controlled by

Dwight Hammond, who is the president, and Dwight's son Steven, who is the vice-president (the

Hammond principals).

60.    HRI has held a series of grazing permits allowing it to release its livestock on four

allotments on the Bureau's Burns District, near the town of Frenchglen on Steens Mountain: the

Mud Creek, Hardie Summer, Hammond FFR, and Hammond allotments (collectively, "Bridge

Creek allotments"). Under the permit in effect from 2004 to 2014, permitted use was as follows:

| ALLOTMENT NUMBER | ALLOTMENT NAME | LIVESTOCK KIND | PERIOD OF USE | PERCENT PUBLIC LAND | ACTIVE AUMS[3] |
|---|---|---|---|---|---|
| OR06005 | MUD CREEK | 390 CATTLE | 05/16 to 06/30 | 100% | 590 |
| OR06023 | HAMMOND | 68 CATTLE | 04/01 to 10/30 | 99% | 471 |
| OR06025 | HARDIE SUMMER | 408 CATTLE | 07/01 to 09/30 | 33% | 407 |
| OR06100 | HAMMOND FFR | 32 CATTLE | 04/01 to 04/30 | 100% | 32 |

*ii.  The Bridge Creek Allotments Contain Unique and Important Natural Resource and Other
     Values.*

61.    The Mud Creek allotment is largely within the Bridge Creek Wilderness Study

Area ("WSA"), designated in 1991 for possible inclusion by Congress in the National

Wilderness Preservation System. The Hammond and Hammond FFR allotments are partially

within the Steens Mountain CMPA, and the Mud Creek and Hardie Summer allotments are

entirely within the Steens Mountain CMPA. The southern portion of what is now the Hardie

---

[3] An animal unit month, or "AUM," is the amount of vegetation required to support one cow or
one cow/calf pair for one month, representing approximately 800 pounds of vegetation. *See also*
43 C.F.R. § 4100.0-5 (defining AUM).

Summer allotment, known as Sylvie's Pasture, lies partially within the Steens Mountain

Wilderness Area. The Fir Groves Area of Critical Environmental Concern ("ACEC") lies almost

entirely within the Hardie Summer allotment; a small portion lies within the Hammond FFR

allotment to the south of the Mud Creek allotment. There are also additional portions of the

Bridge Creek allotments inventoried by citizens and found to meet Congress' definition of

wilderness.

62.    The Bridge Creek area is precious to native peoples, who have inhabited and used

the area for thousands of years. Like much of Steens Mountain, the Bridge Creek area is rich in

geophytic, edible root populations and seasonal abundance of wildlife that prompted prehistoric

inhabitants to set up seasonal camps. There is evidence of human occupation of the area from as

long as 10,000 years ago. Although only a tiny percentage of the Bridge Creek allotments have

been inventoried for cultural resources, 19 recorded sites occur on the Hammond Allotment

alone, and artifacts are assumed to occur throughout the Bridge Creek allotments. All of the sites

where adverse impacts to cultural resources were noted on the Hammond Allotment had been

affected by livestock grazing.

63.    All of the Bridge Creek allotments include essential habitat for greater sage-

grouse. The area lies within the Steens Priority Area of Conservation ("PAC")—one of 20 PACs

in Oregon, first identified in 2013 by the U.S. Fish and Wildlife Service in its expert

Conservation Objectives Team Report. That report identified preserving PACs as "the essential

foundation for sage-grouse conservation."

64.    As shown on the map below, the Mud Creek allotment is entirely within Priority

Habitat Management Area ("PHMA") identified by the Bureau in the 2015 Oregon ARMPA.

The Hardie Summer, Hammond, and Hammond FFR allotments also include General Habitat

Management Areas ("GHMA"). PHMAs have "the highest value to maintaining sustainable

[greater sage-grouse] populations. . . .  These areas include breeding, late brood-rearing, winter

concentration areas, and migration or connectivity corridors." Oregon ARMPA at 1–5. GHMAs

are "lands where some special management will apply to sustain [greater sage-grouse]

populations; areas of occupied seasonal or year-round habitat outside of PHMA." *Id.*



65.     There are seven sage-grouse breeding areas (called "leks") within four miles of the Bridge Creek area, including one active lek on the Mud Creek Allotment. The Bridge Creek allotments support an important habitat corridor that connects to a large Sagebrush Focal Area ("SFA") to the southeast. Under the ARMPA, SFAs are "a subset of PHMA . . . that represent recognized strongholds for [greater sage-grouse] that have been noted and referenced as having the highest densities of [greater sage-grouse] and other criteria important for the persistence of the species." Oregon ARMPA at 5–20.

66.     Sagebrush is critical for the greater sage-grouse, which is a "sagebrush obligate" species that relies upon the sagebrush steppe ecosystem for all its habitat needs. Greater sage-grouse is a landscape species that uses a variety of seasonal habitats throughout the year. Leks and associated nesting and brood-rearing habitats are especially important to the species' life cycle. The grouse have high fidelity to leks, and most hens will nest within four miles of the lek where they mated. The Bridge Creek allotments contain 21,972 acres of sage-grouse breeding season (lekking, nesting, and early brood-rearing) habitat, 12,066 acres of summer habitat, and 21,970 acres of winter habitat.

67.     The sagebrush ecosystem is among the most vulnerable in North America. The sage-grouse is in danger of extinction from fragmentation and loss of its sagebrush habitat and increasing isolation of populations due to human activities, including livestock grazing, energy development and transmission, and ever-expanding motorized transportation networks. Fire, invasive weeds, and livestock grazing are three of the greatest threats to sage-grouse persistence in Oregon, because they remove sagebrush and reduce sage-grouse habitat quality.

//

//

68.    The Bridge Creek allotments have been heavily impacted by wildfire, including the 2006 Krumbo Butte fire set by the Hammond principals and the 46,522-acre Grandad fire, also likely set by the Hammond principals.

69.    The timing of population declines of both sage-grouse and mule deer in the area coincide with this habitat loss and infestations of invasive annual grasses that have increased as a result of frequent fires in the area and further threaten the establishment and recovery of future shrubland habitat. The majority of the frequent fires in the area during at least the past two decades were likely set by the Hammond principals.

70.    Several streams on the four allotments are home to redband trout, a native fish classified as sensitive by the Bureau and the Oregon Department of Fish and Wildlife ("ODFW"). Redband trout inhabit Krumbo Creek, Bridge Creek, Mud Creek, Big Bridge Creek, Little Fir Creek, Big Fir Creek, Lake Creek, and Fish Creek on the Bridge Creek allotments. Grazing has altered the structure and function of streams and ecosystems, impacted watershed processes, and contributes significantly to factors limiting redband trout populations. For instance, Krumbo Creek is not achieving State water quality standards, largely due to "historic" grazing, including grazing by HRI before periods of rest began following the 2006 fires set by the Hammond principals. The Final Decision approves livestock grazing on the Hammond Allotment that may occur during the redband trout spawning season on Krumbo Creek.

iii.  *Ecological Degradation Caused by Livestock Grazing*

71.    Livestock grazing is one of the most ubiquitous threats to the sage-grouse. Grazing cattle consume native plants, trample and destroy soils and fragile spring and riparian areas, and increase the spread of sagebrush-replacing weeds. Cattle grazing in nesting areas

during the April-May nesting season can cause sage-grouse hens to abandon their nests. The infrastructure of watering systems and barbed-wire fencing needed to manage large herds of cattle in the desert also fragment and destroy sagebrush habitat, artificially concentrating cattle in important sage-grouse habitat areas, dewatering natural springs and water courses, and creating thousands of potential breeding grounds for fatal West Nile virus-carrying mosquitoes as water stagnates in reservoirs, troughs, and even cattle hoof prints.

72.     Grazing by livestock in the spring negatively affects native plant communities upon which female sage-grouse depend for concealing their nests and protecting chicks. Grazing in this period should be avoided because it overlaps the nesting and breeding season. Late season grazing also negatively affects native plant communities important in providing concealment cover for early nesting female sage-grouse in the next year.

73.     Cattle grazing also disturbs biological soil crusts, removes native vegetation, and facilitates the spread of cheatgrass, a non-native invasive weed. Cheatgrass invasion shortens fire cycles and may cause or contribute to the spread of wildfire. Weeds and wildfire degrade sage-grouse habitat.

74.     Cattle grazing greatly alters the structure and composition of riparian zones and hence their inestimable value as centers of biological diversity. In the short term, grazing can depress both plant growth and reproduction. Grazing depresses native plant vigor and causes soil compaction and erosion that facilitates the introduction and spread of invasive plants and noxious weeds. Grazing also causes a corresponding decline in root biomass of riparian vegetation. At stream edges, the combination of root loss and trampling weakens and collapses banks. Bank loss and the resulting soil erosion of sediment results in down cut (*i.e.*, incised) and widened streams, as well as degradation of water quality and fish habitats.

75.     Cattle can thus rapidly and severely degrade riparian areas. Shallower, wider streams impacted by cattle have higher temperatures, altered water quality, and suffer biotic changes. These changes decrease the quality of cattle-impacted streams for redband trout habitat.

76.     Redband trout, like many other salmonids, thrive in cold, deep, fast running water, and require overhanging streambanks for hiding cover, vegetation for shading to maintain cool temperatures, and clean gravels to spawn. They spawn in the spring and remain in place until migrating to overwintering areas in the fall.

iv.  *Misuse of the Bridge Creek Allotments by HRI Principals*

77.     This Court has described at length, in Case No. 2:19-cv-0750-SI, relevant background pertaining to HRI's prior grazing permit and the federal convictions of Dwight and Steven Hammond related to the fires they intentionally set on Steens Mountain that burned the Bridge Creek allotments. *See, e.g.*, *Bernhardt*, 428 F. Supp. 3d at 337–40. After the Bureau denied HRI's application to renew its grazing permit in 2014, based on HRI's unsatisfactory record of performance and violation of the terms of conditions of the expiring permit, former Secretary Zinke stepped in and ordered the Bureau to nevertheless renew the permit based on President Trump's pardon of the convicted arsonists. *Id*. at 340–42.

78.     The Bureau complied with the Secretary's direction in February 2019 and HRI turned out cattle onto the Hammond FFR Allotment shortly thereafter.

79.     On March 25, 2019, HRI turned out 423 cattle more than the 68 allowed by its permit on the Hammond Allotment, ten days before it was allowed to do so under the permit terms.

80.     On May 13, 2019, three days before turnout on the Mud Creek allotment would have been allowed under the permit terms, plaintiffs WWP, the Center, and Guardians filed a

Complaint in this Court challenging the Secretary's Decision and grazing permit and seeking injunctive relief preventing turnout on the Mud Creek and Hardie Summer allotments. *W. Watersheds Proj. v. Bernhardt*, No. 2:19-cv-0750-SI (D. Or. filed May 13, 2019). The Bureau agreed not to allow HRI to turn cows out onto the Mud Creek Allotment until the Court was able to rule on the plaintiff's injunction motion.

81.     On June 5, 2019, this Court issued an order granting the plaintiffs' motion for a temporary restraining order and enjoining the Bureau from allowing turnout on the Mud Creek and Hardie Summer allotments. *W. Watersheds Proj. v. Bernhardt*, 391 F. Supp. 3d 1002 (D. Or. 2019). The temporary restraining order was extended through July 17, 2019, by stipulation of the parties. Meanwhile, HRI's cattle continued to graze on the Hammond Allotment, consuming at least 2,975 AUMs of forage in total—more than 600% of the 471 AUMs permitted.

82.     The Court held an evidentiary hearing on the plaintiffs' preliminary injunction motion on June 28 and July 2, 2019. Following the hearing, the Court granted the injunction in part, but issued an order allowing HRI to "quickly and methodically" trail through the Mud Creek Allotment for a time not to exceed 14 days and to graze the Hardie Summer Allotment up to a maximum of 30% utilization. The Court also enjoined the Bureau from allowing grazing in the Fir Creek unit on the Hardie Summer Allotment and required the Bureau to monitor actual use of the allotments, as well as the condition of riparian areas, and report back to the Court. *W. Watersheds Proj. v. Bernhardt*, 392 F. Supp. 3d 1225, 1263–64 (D. Or. 2019).

83.     HRI took two days to trail its cattle through the Mud Creek Allotment to reach the Hardie Summer Allotment, but spent 13 days returning. Not only did this exceed the 14 days' total use allowed by the Court's order, but it also ran afoul of the Court's direction to "quickly and methodically" trail through the allotment.

84.     The Bureau did not quantitatively measure riparian utilization following grazing on the Hardie Summer Allotment. A team of four independent expert ecologists retained by the plaintiffs spent five days on Hardie Summer Allotment from September 30 to October 4, 2019, recording ecological conditions post-grazing using an "Enhanced Multiple Indicator Monitoring Approach." Their report concluded that the herbaceous utilization in the riparian zones of Hardie Summer Allotment ranged from 43% to 87%. Shrub utilization in those areas ranged from 27% to 88%. Streambank alteration ranged from 49.8% to 65.8%. Residual herbaceous stubble height was between 1.7 inches and 8 inches. The riparian utilization the experts recorded far exceeded the 30% utilization allowed by the Court's order.

85.     In addition, HRI grazed 795 AUMs on the Hardie Summer Allotment in 2019. This was nearly double the amount allowed under the terms of HRI's grazing permit.

86.     This overuse by HRI continued a well-established pattern of ignoring its permit terms and conditions. HRI also violated the terms of its permit by grazing excess AUMs in 2006, 2007, 2008, 2009, 2011, 2012, and 2013—before eventually losing its permit in 2014.

87.     This Court held that the Secretary violated the APA and vacated the Secretary's decision, along with the unlawfully issued grazing permit, on December 20, 2019. *Bernhardt*, 428 F. Supp. 3d at 342–54.

*v.    Former Secretary Bernhardt's January 19, 2021 Final Decision to Issue a New Permit to HRI*

88.     Former Secretary Bernhardt determined the Court's December 20, 2019 decision revived HRI's administrative appeal of the Bureau's 2014 decision not to renew the permit, and, citing 43 C.F.R. § 4.5, therefore "continued" to exercise jurisdiction over the appeal.

89.     On March 19, 2020, Secretary Bernhardt ordered the Bureau to solicit applications from qualified applicants to graze on the Bridge Creek allotments and undertake "an

appropriate [NEPA] analysis" based on the applications received. Following this order, HRI

withdrew its administrative appeal, and Secretary Bernhardt issued an order on May 15, 2020

dismissing HRI's appeal and directing the Bureau to continue the adjudication process for the

available forage in the four allotments. At that point, Secretary Bernhardt's jurisdiction

terminated, because no appeal, or "case," existed from that point forward.

90.    The Bureau received four applications, including one from HRI.

91.    On October 19, 2020, the Bureau issued a scoping notice inviting public input on

a proposal to authorize grazing. The Bureau accepted public comments through October 27,

2020. WWP, ONDA, and others timely submitted information for the Bureau's consideration.

92.    On December 7, 2020, the Bureau issued a draft EA and draft Finding of No

Significant Impact ("FONSI"). The Bureau stated it would accept public comments on those

documents through December 20, 2020. WWP learned of the EA after staff had emailed the

Bureau to ask for a status update on December 8, 2020. The Bureau informed WWP that the EA

had been issued the previous day. The EA was not available for public review on BLM's

ePlanning website until December 9, 2020. That day, again only after WWP asked, the Bureau

informed WWP that the comment period would be open until December 20, 2019. WWP and

ONDA requested that the comment be extended to include at least 30 days. The Bureau did not

respond to WWP's request. To ONDA, the Bureau said only that the group's request "has been

noted and will be discussed." Accordingly, Plaintiffs had only eight business days to review the

EA/FONSI and provide comments. Again WWP, ONDA, and others scrambled to review and

digest the 249-pages of technical information and timely submit comments, and were prejudiced

by not having a reasonable amount of time to do so.

93.     In the final hours of December 31, 2020, the Bureau posted a Proposed Decision (digitally signed at 19:32:48) and Final EA on its ePlanning website—just eight business days after the comment period on the Draft EA concluded. The agency referenced a "Response to Comments" as an "Appendix L" to the EA, but the Bureau failed to include that appendix with the Proposed Decision on the agency's ePlanning website. ONDA only received the Appendix along with the paper copy of the EA it received in the mail, in the second week of January; WWP never received it. The Bureau finally made a copy of Appendix L available to the public for the first time on its ePlanning project site on February 22, 2021.

94.     The Proposed Decision did not adopt an alternative analyzed in the EA. Instead, it adopted portions of Alternatives 2, 3, and 4, which included "approval of the Hammond, Mud Creek, Hardie Summer, and Hammond FFR AMPs, issuance of a grazing permit, livestock grazing management, and range improvements, specifically Bridge Creek water gap extension, fence removal, fence construction, and spring and pipeline development with associated troughs."

95.     While not immediately clear from the description of the action, the Proposed Decision also included a massive increase in permitted AUMs, and it substantially reconfigured the allotments, moving several allotment units (which the Bureau refers to as "pastures") from the Hammond and Hardie Summer allotments into the Hammond FFR Allotment. These boundary reconfigurations effectively eliminate Bureau oversight of grazing in those areas by converting them from an I or M designation to a C designation. They also allow the areas to now be grazed year-round. The units moved into the Hammond FFR allotment include a portion of Little Fir Creek, a redband trout-bearing stream, and the Sylvie's Pasture, which includes much of the sagebrush habitat on the allotments left untouched by the 2006 Grandad Fire that was

likely set by the HRI principals and which has high value to greater sage-grouse. An area formerly managed as part of the Hammond FFR allotment was also released into private control, even though the FFR contains a small amount of federal land. In addition, the new permit allows HRI to conduct year-round grazing on the Hammond Allotment, which includes Krumbo Creek, an important redband trout stream.

96.     Because this major restructuring and new action was effectively introduced for the first time in the Proposed Decision issued late on December 31, 2020, the public was never afforded an opportunity to review and comment upon the Secretary's new plan during the NEPA process, in October. The Bureau's EA did not analyze the effects of the action actually adopted by the Secretary. Among other concerns, the Bureau never considered the fish and wildlife impacts of the boundary changes associated with the Secretary's action. The EA and Proposed Decision assumed that impacts to imperiled species would be addressed by measures intended to control grazing on the Mud Creek and Hardie Summer allotments, but ignored that none of these measures apply to the high value wildlife habitats now transferred to the Hammond FFR Allotment, where grazing is now permitted year-round.

97.     The Bureau's grazing regulations provide that an interested public "may protest the proposed decision under § 4160.1 of this title in person or in writing to the authorized officer within 15 days after receipt of such decision." 43 C.F.R. § 4160.2. According to Deputy Assistant Secretary Hammond's letter, citing 43 C.F.R. § 4160.3, "[a] final decision will issue *after* the protest period concludes." (Emphasis added).

98.     The Bureau sent WWP and ONDA "courtesy copies" of the Proposed Decision by email on January 1, 2021, a federal holiday. However, WWP and ONDA did not receive an official copy the Proposed Decision until a week later or more.

99.    ONDA officially received the Proposed Decision on January 8, 2021. Fifteen days from January 8 is January 23. As that day was a Saturday, ONDA calculated that its protest deadline was Monday, January 25, 2021. WWP received the Proposed Decision on January 9, 2021. Fifteen days from January 9 was January 24. As that day was a Sunday, WWP also calculated its protest deadline as Monday, January 25, 2021.

100.    ONDA was concerned, however, when the Bureau stated in its January 13, 2021, update to the Southeast Oregon Resource Advisory Committee that the 15-day protest period ended on January 15, 2021. ONDA wrote and asked the Bureau to confirm ONDA's January 25, 2021, protest deadline. The Bureau's response, in full, was: "The protest period on the Proposed Decision will conclude January 15, 2021, at 5:00 PM PST."

101.    Even if the "courtesy copies" sent on January 1, 2021 were sufficient to start the protest period under 43 C.F.R. § 4.22(e), this meant that fifteen days would have expired on Saturday January 16, 2021, and ONDA and WWP would have until January 19, 2021 to timely submit protests, since January 18 was Martin Luther King, Jr. Day, a federal holiday.  *See* 43 C.F.R. § 4.22.

102.    However, given the Bureau's statement that the protest period would close for all parties on January 15, 2021, regardless of when (or even whether) they received the agency's Proposed Decision, WWP, ONDA, and other members of the public scrambled to review the Proposed Decision and to submit timely administrative protests within the shortened period.

103.    WWP and ONDA both submitted protests on January 15, 2021, noting, however, that they had been prejudiced by the unlawfully short protest period, and reserving the right to submit additional protest points through the end of the protest period. WWP also requested a protest resolution meeting with the Bureau following the expiration of its protest period.

104.    Through their participation in the public processes surrounding the Bridge Creek allotments, Plaintiffs alerted the Bureau that HRI's longstanding record of noncompliance with its grazing permit terms and conditions, including in 2019 during the first phase of this litigation, made it an unqualified applicant to receive a grazing permit. They complained that the EA's inappropriately narrow definition of the "purpose and need" for the action unduly limited the range of alternatives and advocated for the Bureau to consider a "restoration" alternative focused on restoring crested wheatgrass seedings, which provide little habitat value for sage-grouse and other wildlife, to native plant communities, as required by the sage-grouse ARMPA. They also noted that the action risked serious impacts—including impacts to sage-grouse, redband trout, wilderness, and cultural resources—that had gone unexamined and unaddressed in the EA. And they repeatedly notified the Bureau that the truncated and unusual comment and protest periods had burdened the public's ability to provide meaningful input, in violation of NEPA and Bureau regulations.

105.    The Bureau received 160 administrative protests by January 15, 2021. The agency has not acknowledged additional protests received after January 15, 2021, but Plaintiff ONDA, for example, submitted a further protest on January 23, 2021. The Bureau purported to resolve the 160 protests it acknowledged in less than one business day (four days, total), summarily dismissing the issues raised by Plaintiffs and other members of the public.

106.    On January 19, 2021, the day before the Presidential inauguration marked the beginning of a new administration, former Secretary Bernhardt claimed he was "exercising jurisdiction over this matter in accordance with 43 C.F.R. § 4.5" and issued a Final Decision to award HRI a new grazing permit and grazing preference over other qualified applicants without considering HRI's record of arsons and noncompliance with the terms and conditions of its

34

permit in assessing its qualifications. The former Secretary's Final Decision found that HRI had

a satisfactory record of performance in the 36 months preceding the date of its forage application

and demonstrated a high level of general need to maintain its "out and back" rotation through

public lands. The Final Decision, issued and signed under Secretary Bernhardt's purported

authority in 43 C.F.R. § 4.5, provided that it was "the final Decision of the Department of the

Interior," "not subject to appeal," and "effective upon issuance."

107.    The Final Decision allows grazing as follows:

| ALLOTMENT | CATTLE # | SEASON OF USE | ANIMAL UNIT MONTH (AUM) |
|---|---|---|---|
| Hammond | 134 | 3/1 – 2/28 | 1,625 |
| Mud Creek | 131 | 6/1 – 10/15 | Up to 590 (Beginning with 295 AUMs and increasing by up to 25% of the remaining AUMs annually over 4 years. This increase would only occur if monitoring shows ecological conditions are continuing to be maintained and providing adequate habitat for wildlife, including GRSG, and grazing effects are below the thresholds identified in Table 6) |
| Hardie Summer | 81 | 7/1 – 11/15 | Up to 364 (Beginning with 204 AUMs and increasing by up to 25% of the remaining AUMs annually over 4 years. This increase would only occur if monitoring shows ecological conditions are continuing to be maintained or improved, and providing adequate habitat for wildlife, including GRSG, and grazing effects are below the thresholds identified in Table 6) |
| Hammond FFR | 439 | 3/1 – 2/28 | 368 |

It would also allow grazing up to 50 percent utilization and up to 60 percent on crested

wheatgrass seedings, although, as this Court is aware, 50 percent utilization is incompatible with

sage-grouse needs. Plus, the EA does not explain whether or how a 50 percent utilization

threshold equates to or otherwise complies with the Oregon ARMPA's seven- and nine-inch

grass height requirements. While the Decision relies heavily on annual monitoring to judge

whether to increase AUMs or utilization, it also admits that monitoring will only be done as funding allows.

108.     Former Secretary Bernhardt's Final Decision and the NEPA analysis it relied upon violated the substantive and procedural requirements of NEPA, FLPMA, and the APA.

<u>**FIRST CLAIM FOR RELIEF:**</u>
**THE SECRETARY VIOLATED FLPMA AND THE APA
BY IMPROPERLY ASSUMING JURISDICTION AND
ISSUING A GRAZING DECISION WITHOUT THE REQUIRED PROCESS**

109.     Plaintiffs reallege and incorporate by reference all preceding paragraphs.

110.     Plaintiffs' First Claim for Relief challenges former Secretary Bernhardt's January 19, 2021 Final Decision for violating FLPMA, the Department of the Interior's regulations, and the APA, because the Secretary improperly assumed jurisdiction over the matter and issued the Final Decision prematurely, without allowing for full public participation, including the required 15-day public protest period. This claim is brought under the judicial review provisions of the APA, 5 U.S.C. §§ 701–706.

111.     While 43 C.F.R. § 4.5 "reserves" to the Secretary "[t]he authority to take jurisdiction at any stage of any *case* before any employee or employees of the Department . . . and render the final decision in the matter…", it does not remove the requirement that his decision comply with Congress's direction in FLPMA, the Department of the Interior's own regulations, or other law. 43 C.F.R. § 4.5(a)(1) (emphasis added).

112.     "If the Secretary or Director assumes jurisdiction of a case or reviews a decision, the parties and the appropriate Departmental personnel will be advised in writing of such action, the administrative record will be requested, and, after the review process is completed, a written decision will be issued." 43 C.F.R. § 4.5(c).

113.    The Secretary's "reserved authority" does not remove the obligation to comply with provisions guaranteeing the public the right to participate in agency decisions. *See* 43 U.S.C. §1701(a)(5).

114.    Copies of proposed decisions must be sent to the interested public. 43 C.F.R. § 4160.1.  Interested publics "may protest the proposed decision . . . in person or in writing to the authorized officer within 15 days *after receipt* of such decision." *Id.* § 4160.2 (emphasis added). "A proposed decision can *only* become administratively final under 43 C.F.R. § 4160.3(a) once the 15-day protest period has run for *all* interested individuals who received the proposed decision." Findings and Recommendations, *Or. Nat. Desert Ass'n v. Bureau of Land Mgmt.*, No. 2:10-cv-01331-SU, at 20 (D. Or. Oct. 25, 2010), ECF No. 140.

115.    The Department of the Interior's regulations provide how the time for protests or appeals is to be calculated:

> Except as otherwise provided by law, in computing any period of time prescribed for filing and serving a document, the day upon which the decision or document to be appealed from or answered was served or the day of any other event after which the designated period of time begins to run is not to be included. The last day of the period so computed is to be included, unless it is a Saturday, Sunday, Federal legal holiday, or other nonbusiness day, in which event the period runs until the end of the next day which is not a Saturday, Sunday, Federal legal holiday, or other nonbusiness day.

43 C.F.R. § 4.22.

116.    The protest period is typically followed by an appeals period during which a grazing decision may be appealed to the Department of the Interior's Hearings Division within the Office of Hearings and Appeals and appellants may seek a stay to prevent the decision from going into effect. *See id*. § 4160.3 (describing grazing appeal procedures).

117.    Secretary Bernhardt violated FLPMA and the APA because he exceeded his authority when he purported to assume jurisdiction under 43 C.F.R. § 4.5 and issue a grazing decision in place of the Bureau without any "case" pending.

118.    Upon information and belief, he further violated FLPMA and the APA because he did not notify the appropriate Departmental personnel in writing or request the administrative record before assuming jurisdiction, as he is required by regulation to do.

119.    Secretary Bernhardt violated FLPMA and the APA because, in issuing the January 19, 2021 Final Decision, he did not allow for adequate public participation, including because he did not allow for the full 15-day protest period after receipt by interested parties, required by regulation.

120.    Secretary Bernhardt violated FLPMA and the APA because he adopted a new way of calculating the time for protest without notifying or engaging the interested public, and without acknowledging his departure from the Department's longstanding practice memorialized in 43 C.F.R. § 4.22.

121.    By improperly exercising his authority under 43 C.F.R. § 4.5 to render the January 19, 2021 Final Decision in the place of the Bureau, and by failing to follow the requirements of the Department of the Interior's own regulations, including by allowing for the public protest period required by regulation, the Secretary violated FLPMA and the APA. The Secretary's actions in issuing the January 19, 2021 Final Decision were therefore arbitrary, capricious, an abuse of discretion, and not in accordance with FLPMA and the Interior Department's regulations, and have caused or threaten serious prejudice and injury to Plaintiffs' rights and interests.

//

**SECOND CLAIM FOR RELIEF:**
**THE SECRETARY VIOLATED FLPMA AND THE APA BY ISSUING HRI A NEW**
**GRAZING PERMIT OVER OTHER QUALIFIED APPLICANTS**

122.     Plaintiffs reallege and incorporate by reference all preceding paragraphs.

123.     Plaintiffs' Second Claim for Relief challenges former Secretary Bernhardt's January 19, 2021 Final Decision for violating FLPMA, the Department of the Interior's regulations, and the APA, because the Secretary improperly found HRI had a satisfactory record of performance and awarded HRI a grazing permit and preference over other qualified applicants. This claim is brought under the judicial review provisions of the APA, 5 U.S.C. §§ 701–706.

124.     The Bureau may only grant a new grazing permit to a qualified applicant. *See* 43 C.F.R. § 4130.1-2.

125.     The Bureau's regulations implementing FLPMA provide that a mandatory qualification for applicants for grazing permit renewal or issuance is that the applicant "must be determined by the authorized officer to have a satisfactory record of performance." 43 C.F.R. § 4110.1(b).

126.     Secretary Bernhardt violated FLPMA and its implementing regulations by considering only the 36 months preceding HRI's forage application in determining that it possessed the mandatory qualification of a satisfactory record of performance, thus failing to consider its longstanding record of permit violations and arson in that determination.

127.     Secretary Bernhardt violated FLPMA and its implementing regulations because he ignored HRI's record of violating the terms and conditions of its grazing permit during the 2019 grazing season in determining it had a satisfactory record of performance that year.

128.    Secretary Bernhardt violated FLPMA and its implementing regulations by improperly balancing the factors in 43 C.F.R. § 4130.1–2 to grant a grazing permit to HRI over qualified applicants.

129.    Secretary Bernhardt thus awarded a grazing permit and preference to an unqualified applicant, in violation of FLPMA and its implementing regulations. The Secretary's actions in issuing the January 19, 2021 Final Decision were therefore arbitrary, capricious, an abuse of discretion, and not in accordance with FLPMA and the Interior Department's regulations, and have caused or threaten serious prejudice and injury to Plaintiffs' rights and interests.

**THIRD CLAIM FOR RELIEF:**
**THE SECRETARY VIOLATED NEPA AND THE APA BECAUSE THE FINAL DECISION WAS BASED UPON A FLAWED AND INADEQUATE EA**

130.    Plaintiffs reallege and incorporate by reference all preceding paragraphs.

131.    Plaintiffs' Third Claim for Relief challenges former Secretary Bernhardt's January 19, 2021 Final Decision and the Bureau's EA/FONSI that formed the basis of that decision, for violating NEPA and the APA, because the decision was based upon a flawed and inadequate EA that overlooked significant environmental impacts warranting an EIS. This claim is brought under the judicial review provisions of the APA, 5 U.S.C. §§ 701–706.

132.    The NEPA process ensures the action agency takes a "hard look" at the environmental impacts of its proposed action and considers the environmental impacts of its proposed action and alternatives to that action.

133.    The range of alternatives to be considered is defined in part based upon the agency's "purpose and need" for the project.  An agency may not so narrowly define its purpose

and need as to unduly restrict consideration of reasonable alternatives. *See, e.g., Muckleshoot Indian Tribe v. U.S. Forest Service*, 177 F.3d 800, 814 n. 7 (9th Cir. 1999).

134.    By preparing an EA, an agency determines whether an action may have a significant impact on the environment warranting an EIS.  If an there are "substantial questions" as to whether a proposed action may have any significant effect, the agency must prepare an EIS. *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 864–65 (9th Cir. 2005).

135.    Defendants violated NEPA, its implementing regulations, and the APA in issuing the Bridge Creek Allotment Management Plan and Environmental Assessment and associated FONSI, and by adopting the January 19, 2021 Final Decision based upon the EA's analysis, in multiple ways including, but not limited to, the following:

a.    By unlawfully refusing or failing to allow for adequate public participation in the Bridge Creek AMP and grazing decision at issue here;

b.    By defining the purpose and need for the action too narrowly including, among other ways, by failing to consider in detail vegetation and habitat restoration or any restoration alternative and failing to consider whether and how the proposed permit and plan would be consistent with ARMPA requirements for vegetative cover and residual grass heights;

c.    By failing to analyze a restoration alternative or otherwise consider vegetation and habitat restoration as part of the permit and planning at issue;

d.    By failing to take a hard look at the impacts of the action and alternatives on resources in the project area including but not limited to sage-grouse, redband trout, cultural resources, and wilderness;

e.    By failing to analyze the environmental effects of the alternative actually adopted against the environmental baseline and by failing to present the agency's analysis in a way that made impacts of that alternative clearly understandable to the public;

f.    By failing to analyze and disclose the effects of transferring important redband trout habitat, unburned sage-grouse habitat, and a portion of the Steens Mountain Wilderness Area into a C allotment, over which BLM exercises virtually no oversight;

g.    By failing to adequately disclose the effects of the grazing authorized, particularly on sage-grouse; and

h.    By failing to prepare an EIS in light of potentially significant impacts to sage-grouse, redband trout, wilderness quality lands, and cultural resources from the action authorized.

136.    By basing the January 19, 2021 Final Decision on a flawed and inadequate EA and FONSI, the Defendants' actions were arbitrary, capricious, an abuse of discretion, and not in accordance with NEPA, and have caused or threaten serious prejudice and injury to Plaintiffs' rights and interests.

**FOURTH CLAIM FOR RELIEF:**
**THE SECRETARY VIOLATED FLPMA AND THE APA BY ISSUING THE**
**JANUARY 19, 2021 DECISION IN VIOLATION OF THE REQUIREMENTS OF THE**
**SAGE-GROUSE PLAN AMENDMENTS TO THE GOVERNING LAND USE PLANS**

137.    Plaintiffs reallege and incorporate by reference all preceding paragraphs.

138.    Plaintiffs' Fourth Claim for Relief challenges former Secretary Bernhardt's January 19, 2021 Final Decision for violating FLPMA, the Department of the Interior's regulations, and the APA, because the Secretary failed to insure that the authorized permit and

actions would be consistent with requirements of the governing land use plans, as amended by the sage-grouse ARMPA. This claim is brought under the judicial review provisions of the APA, 5 U.S.C. §§ 701–706.

139.    FLPMA requires the Bureau to "develop, maintain, and . . . revise" land use plans in order to carry out its obligations to manage the public lands "in a manner that will protect the quality of scientific, historical, ecological, environmental, air and atmospheric, water resource, and archeological values" and "preserve and protect certain public lands in their natural condition." 43 U.S.C. §§ 1701(a)(8), 1712(a)–(c); 43 C.F.R. § 1610.5-5. Once developed, the Bureau must manage the public lands "in accordance with" these land use plans. 43 U.S.C. § 1732(a).

140.    The Secretary and the Bureau have violated FLPMA and its implementing regulations through issuance of the January 19, 2021 Final Decision. These violations include, but are not limited to:

    a.    Failing to manage the public lands in accordance with the Oregon ARMPA, which requires the Secretary to—

        i.    manage land resource uses in sage-grouse habitat "to meet the desired conditions described in Table 2-2" (Habitat Objectives Table), including setting 7- and 9-inch grass height standards for arid and mesic sites, respectively, for grazing between March 1 and June 30 (Objective SSS 4);

        ii.    "[r]educe the area dominated by invasive annual grasses to no more than 5 percent within 4.0 miles" of all leks (Objective VEG 3);

      iii.    "[a]djust discretionary land uses, such as active use for livestock grazing or recreational uses or seasons, as needed to facilitate attainment and persistence of vegetation restoration objectives" (MD VEG 12); and

      iv.    ensure, for any management action that would result in habitat loss or degradation, that the action "require and ensure mitigation that provides a net conservation gain to the species including accounting for any uncertainty associated with the effectiveness of such mitigation," to be "achieved by avoiding, minimizing, and compensating for impacts by applying beneficial mitigation actions" (MD SSS-10); and

   b.    Failing to prevent unnecessary or undue degradation of public lands and resources, including by failing to consider and explain whether there will be any unnecessary or undue degradation to, or permanent impairment of, the lands as a result of the Secretary's decision to permit livestock grazing on the Bridge Creek allotments.

141.    The Secretary's January 19, 2021 Final Decision to issue a grazing permit and AMP for the Bridge Creek allotments therefore is arbitrary, capricious, an abuse of discretion, and not in accordance with FLPMA and its implementing regulations, and has caused or threatens serious prejudice and injury to Plaintiffs' rights and interests.

**FIFTH CLAIM FOR RELIEF:**
**THE SECRETARY VIOLATED THE STEENS ACT AND APA BY ISSUING THE**
**JANUARY 19, 2021 DECISION WITHOUT ENSURING THAT IT WOULD PROTECT**
**THE "LONG-TERM ECOLOGICAL INTEGRITY" OF STEENS MOUNTAIN**

142.    Plaintiffs reallege and incorporate by reference all preceding paragraphs.

143.    Plaintiffs' Fifth Claim for Relief challenges former Secretary Bernhardt's January 19, 2021 Final Decision for violating the Steens Act and the APA, because the Secretary failed to

insure that the authorized permit and actions would be consistent with requirements of the Steens Act. This claim is brought under the judicial review provisions of the APA, 5 U.S.C. §§ 701–706.

144.    The Steens Act requires the Secretary to conserve, protect, and manage the "long-term ecological integrity" of Steens Mountain for future and present generations. 16 U.S.C. § 460nnn-12(a).

145.    The Steens Act directed the Secretary to prepare "a comprehensive plan for the long-range protection and management of the Federal lands included in the [CMPA]." 16 U.S.C. § 460nnn-21(b). The Secretary and the Bureau must manage the public lands in these areas in accordance with the Steens Act and the CMPA RMP. 16 U.S.C. § 460nnn-21(a); 43 U.S.C. § 1732(a).

146.    The Secretary and Bureau violated the Steens Act in multiple respects through issuance of the January 19, 2021 Final Decision and the approved AMP/EA/FONSI. These violations include, but are not limited to:

a.    Failure to provide for the conservation, protection, and management of long-term ecological integrity within the CMPA on Steens Mountain;

b.    Issuance of a Final Decision that is not consistent with the Steens Act and requirements of the CMPA RMP; and

c.    Incorrectly interpreting the Steens Act by stating that "[p]rotecting and managing long-term ecological integrity while promoting viable and sustainable grazing operations are both purposes of the Steens Act."

147.    The Secretary's January 19, 2021 Final Decision to issue a grazing permit and AMP for the Bridge Creek allotments therefore is arbitrary, capricious, an abuse of discretion,

45

and not in accordance with the Steens Act, and has caused or threatens serious prejudice and injury to Plaintiffs' rights and interests.

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Plaintiffs respectfully request that the Court grant the following relief:

A.    Order, declare, and adjudge that the Secretary's Final Decision to approve the Bridge Creek AMP and grant a grazing permit and preference to HRI is unlawful and a violation of FLPMA, NEPA, the Steens Act, and the APA;

B.    Order, declare, and adjudge that the Secretary's and the Bureau's actions failing to "consult, coordinate, and cooperate" with the interested public, including by unlawfully shortening the public protest period required by law, violated FLPMA and the APA;

C.    Order, declare, and adjudge that the Bridge Creek Area AMP and EA and associated FONSI violated NEPA and the APA;

D.    Order the Bureau to complete an EIS to comply with NEPA;

E.    Issue an order vacating and remanding the Secretary's decision, the grazing permit and preference, the AMP, and the FONSI, and/or other decisions named herein;

F.    Enjoin the Bureau from allowing grazing on the Bridge Creek allotments unless and until Defendants have issued a final decision in compliance with the public process and substantive requirements of FLPMA, NEPA, the Steens Act, and the APA; properly determined that any applicant selected has a satisfactory record of performance that is a mandatory condition of issuance of the permit; completed a lawful environmental analysis; complied with governing land use plan requirements; and otherwise processed the permit application in compliance with NEPA, FLPMA, the Steens Act, and the APA;

G.      Award Plaintiffs their reasonable costs, fees, and other expenses associated with this litigation as provided by the Equal Access to Justice Act, 28 U.S.C. § 2412 *et seq*., and all other applicable authorities; and

H.      Grant such other further relief as Plaintiffs may request or the Court deems just and proper.

DATED this 25th day of February, 2021.                    Respectfully submitted,

                                                          s/ Talasi B. Brooks
                                                          _____

                                                          Talasi B. Brooks
                                                            (*Pro Hac Vice* application to be filed)
                                                          Western Watersheds Project


                                                          s/ Peter M. Lacy
                                                          _____

                                                          Peter M. ("Mac") Lacy
                                                          Oregon Natural Desert Association

                                                          Attorneys for Plaintiffs